UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTAMEX INTERNATIONAL, INC., OLDCASTLE BUILDINGENVELOPE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, ZURICH INSURANCE COMPANY, <br><br> Defendants. | Case No.: 1:20-cv-15232-JHR-AMD <br><br> **OPINION** |

Antamex International, Inc. and Oldcastle BuildingEnvelope, Inc., as alleged successor-in-interest to Antamex (BuildingEnvelope, Inc., and Antamex, together, "Antamex" or "Plaintiffs") was hired as a subcontractor for the construction of a mixed-use building formerly known as The Pier Shops at Caesars in Atlantic City, New Jersey (the "Project"). Antamex performed work relating to the installation of Insulated Glass Units ("IGUs") comprising the building's glass curtain wall system (the "Curtain Wall"). This action presents coverage issues arising out of an action brought by the owner of the Project against Antamex seeking to recover certain costs associated with the removal and replacement of the Curtain Wall (the "Underlying Action").[1] Specifically, Antamex seeks a declaratory judgment that defendant Zurich American Insurance Company ("ZAIC") and Zurich Insurance Company ("ZIC") (ZAIC and ZIC, together, "Zurich" or

---

[1] *See HQ13-1 Atlantic Ocean LLC v. Tutor Perini Building Corp., et al.*, 14-cv-1703-RBK-AMD (D.N.J).

1

"Insurers") must provide insurance coverage under certain commercial general liability ("CGL") and umbrella policies for defense and indemnity costs incurred by Antamex in the Underlying Action. Presently before the Court are Zurich's Motion for Summary Judgment as to Liability [Dkt. 85] as well as Zurich's Motion for Summary Judgment as to Damages [Dkt. 86]. For the reasons to be discussed, the motions will be granted.

I.  **Background**

   a.  **The Underlying Action**

HQ13-1 Atlantic Ocean LLC ("HQ13-1") is the successor to the owner of the Pier Shops at Caesars in Atlantic City, New Jersey. On March 17, 2014, HQ13-1 commenced the Underlying Action naming parties that allegedly caused or contributed to construction defects at the Pier Shops. The complaint in the Underlying Action (the "Underlying Complaint") specifically alleges defects involving the glass Curtain Wall that became visually obstructed by a dark-colored "dripping" material sandwiched between two layers of glass, known as the IGUs, and worsened over time. *See* Underlying Complaint ¶ 23 [Dkt. 97-5].

Among the defendants, cross-defendants, and third-party defendants named in the Underlying Action is Tutor Perini, Antamex, Trulite and Truseal. The Underlying Action complaint alleged that HQ13's predecessor contracted with Tutor Perini in or about 2003 to serve as the general contractor for the construction of the Pier Shops, which was ongoing through at least 2007. *Id.* ¶¶ 3, 13-14.

Tutor Perini, as general contractor, subcontracted with Antamex "to supply and install a glass curtain wall at the Project." *Id.* ¶ 6. Antamex subcontracted with Trulite to

supply and assemble the IGUs. *Id.* ¶ 8. Trulite further subcontracted with Truseal to provide the sealant that Trulite used to manufacture the IGUs. *Id.*

HQ13's consultants determined that the dark-colored dripping substance was polyisobutylene ("PIB"), which is the sealant material used inside each of the IGUs. *Id.* ¶ 24; *see also* Report of Jerome Klosowski [Dkt. 105-29] ("Klosowski Report"). Based upon the results of a visual survey along with laboratory analysis of the PIB sealant, it was concluded that prolonged and continued exposure to sunlight induced a deleterious reaction of chain-scission in the PIB resulting in reduced viscosity of the sealant material that caused it to migrate. *See* Report of Wiss, Janney, Elstner Associates, Inc. at Page 6 [Dkt. 105-30] ("WJE Report"). This condition was further exacerbated by elevated service temperatures occurring after the material had been compromised. *Id.* The Underlying Complaint alleged that

> As a result of the defective PIB sealant, the glass units installed in the Project's Curtain Wall system, and the Project's Curtain Wall as a whole, are defective and unfit for their intended use. Among other things, vision through the glass units is materially obstructed. Moreover, because the PIB sealant is the primary sealant in the glass units, its deterioration and failure has materially damaged and impaired the performance and functionality of the Project's Curtain Wall.

Underlying Compl. ¶ 25. According to the Underlying Complaint, HQ13 provided notice to defendants of these defects in July 2013. *Id.* ¶ 26.

HQ13 alleged breach of contract against Tutor Perini; breach of express and implied warranties against Trulite and OBE entities; breach of implied warranties of habitability and workmanship against Tutor Perini and OBE entities; products liability claims against Trulite; and a negligence cause of action against all defendants. *See id.* ¶¶ 34-67. HQ13 demanded general and special damages, past and future costs of repairs,

diminution of value, consequential damages, investigation costs and analysis-related costs, costs and attorney fees, and prejudgment interest. Tutor Perini filed a third-party complaint against Antamex on December 6, 2016, alleging that Antamex agreed to indemnify Perini pursuant to its subcontract. Defendants' Combined Statement of Material Facts in Support of Motions for Summary Judgment, ¶ 14 [Dkt. 91].[2] On October 7, 2019, Antamex and other parties reached a settled with HQ13. *Id.* ¶ 16.

### b.   The Instant Action

Antamex now seeks to recover costs incurred in defending and settling the Underlying Action and as the result of ZIC and ZAIC's alleged unlawful failure to defend and indemnify Antamex and Perini.

In 2013 and 2014, Antamex and Perini each demanded that Insurers defend and indemnify them in connection with the Underlying Action based on certain commercial general liability policies issued by Insurers. Plaintiffs' Responsive Combined Statement of Material Facts with Supplemental Material Facts ¶¶ 92-94 [Dkt. 97-1]. ZAIC denied both Antamex's claim and Perini's claim. *Id.* ¶¶ 99-100. ZIC denied Antamex's claim but never issued a coverage position letter as to Perini's claim. *Id.* ¶¶ 96, 101.

Insurers declined to provide coverage to Antamex on the stated grounds that: (1) Perini, OBE, OBE Canada were not named insureds under the Policies; and (2) there was no property damage caused by an occurrence. *Id.* ¶ 102. Antamex contends that

---

[2] The parties do not dispute that Antamex was obligated to indemnify Perini with respect to the Underlying Action pursuant to the subcontractor agreement between Antamex and Perini. Plaintiffs' Responsive Combined Statement of Material Facts with Supplemental Material Facts ¶ 82 [Dkt. 97-1].

"[b]ecause ZIC and ZAIC declined to provide coverage to Antamex, Antamex was forced to defend itself and Perini." Br. in Opp. at *3 [Dkt. 97].

In the Complaint filed in this action, Antamex alleges that the conditions at issue in the Underlying Action constitute "property damage" and an "occurrence," so as to afford coverage within the ZAIC and ZIC commercial general liability policies. Antamex asserts claims against Insurers for breach of contract, insurance bad faith, and breach of the implied covenant of good faith and fair dealing.

Now, the Insurers move for summary judgment on all claims. *See generally* Mot. in Supp. [Dkt. 85]. Insurers assert that Antamex is not entitled to coverage in connection with the Underlying Action because: (1) the alleged property damage occurred outside the policy period because the migrating sealant was not observed until 2012; (2) there was no damage to any property beyond the curtain wall; (3) there was no "occurrence" as defined in the respective Policies; (4) certain business risk exclusions bar coverage; and (5) Antamex cannot show that Insurers acted in bad faith because Insurers diligently investigated Antamex's claims and had a fairly debatable reason to deny coverage. *Id.*

### c.   The Policies

Antamex was insured under commercial general liability policies issued by ZAIC and ZIC. ZIC issued Commercial General Liability Policy No. 8831550 to Antamex effective March 31, 2003 to March 31, 2004 and renewed by endorsement annually through expiration March 31, 2007 ("ZIC Primary Policies"). Plaintiffs' Responsive Combined Statement of Material Facts with Supplemental Material Facts ¶¶ 41-42 [Dkt. 97-1]. ZIC also issued umbrella liability policies ("ZIC Umbrella Policies") during the

same policy periods. Defendants' Combined Statement of Material Facts ¶ 26. The ZIC Umbrella Policies follow the same provisions, exclusions and limitations, unless otherwise directed. *Id*.

ZAIC issued Commercial General Policy No. GLO 3792487-00 for the policy period March 31, 2005 to March 31, 2006 to Antamex. *Id*. ¶ 32 This policy was renewed as GLO 3792487-01 to Antamex for the policy period March 31, 2006 to March 31, 2007. *Id*. ¶ 33.

The insuring agreements within the Zurich policies provide that any "property damage" caused by an "occurrence" must occur within the applicable policy periods in order for coverage to trigger. Br. in Supp. at *2. "Property damage" is defined in the ZIC Policy as "physical injury to or destruction of tangible property, including the loss of use thereof resulting therefrom" or "loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an occurrence." Plaintiffs' Responsive Combined Statement of Material Facts with Supplemental Material Facts ¶ 46. The ZAIC CGL Policy contains substantially the same definition. *See id*. ¶ 54. "Occurrence" is defined in the ZIC CGL Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in Bodily Injury or Property Damage, and which is neither intended nor expected from the standpoint of the Insured." *Id*. ¶ 45. "Occurrence" is defined in the ZAIC CGL Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at ¶ 53. The New Jersey Supreme Court has defined "accident" in the context of a CGL policy as "unintended and

6

unexpected harm caused by negligent conduct." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 226 N.J. 403, 427, 143 A.3d 273, 287 (2016).

## II.   Legal Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id*. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. In an insurance coverage action, the party seeking coverage "bears the burden of bringing its claim within the basic terms of the insurance policy." *Arthur Andersen LLP v. Federal Ins. Co.*, 416 N.J. Super. 334,

347 (App. Div. 2010); *Cadre v. Proassurance Cas. Co.*, No. CV 16-0103, 2016 WL 3844208, at *4 (D.N.J. July 14, 2016). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57.

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249.

### III. Discussion

#### a. Whether ZIC is estopped from arguing coverage was not available to Antamex.

In their first point in opposition to Insureds' motion, Antamex argues that ZIC is estopped from contesting coverage and amounts demanded under the count for bad faith because ZIC failed to deny coverage as to Perini's claim as an additional insured.

Reference to the Second Amended Complaint reveals that the claims in this litigation are claims by Antamex and OBE based upon ZIC's and ZAIC's failure to provide coverage under the insurance policies issued to Antamex. While Antamex alleges that "Antamex incurred hundreds of thousands of dollars in legal fees, costs and expenses litigating the Underlying Action on behalf of itself and Perini[,]" absent from the Second Amended Complaint is any claim seeking recovery for ZIC's failure to consider Perini's claim as an additional insured. Second Amended Complaint ¶ 53 [Dkt.

8

14]. Importantly, the additional insured provision of the agreement creates obligations separate from the indemnity coverage at issue in the instant action. The contract-based causes of action stemming from ZIC's coverage obligations to Antamex are therefore distinct from Perini's coverage as an additional insured. Because Antamex has not clearly pleaded a cause of action premised upon the doctrine of subrogation or any other theory of recovery seeking to enforce the additional insured rights of Perini's, ZIC's purported failure to deny Perini's claim does not foreclose ZIC's argument that coverage was not available to Antamex.

### b. Whether the underlying action asserts "property damage" during the applicable ZIC policy period

A linchpin issue presented by this motion is whether there exists a material question of fact that property damage occurred during the applicable Zurich policy periods.[3] Insurers argue that there is no evidence of "property damage" caused by an "occurrence" within the policy period and, thus, coverage was not triggered. More specifically, Insurers contend that because there is no evidence that the sealant began dripping during the policy periods and the condition was not observed until five years after the policies lapsed, Antamex is unable to demonstrate an occurrence as a matter of law. In support of its argument, Antamex advocates for the application of the "injury-in-fact" approach, which holds that "coverage is triggered by a showing of actual injury or damage-producing event." *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 451, 650 A.2d 974, 981 (1994).

---

[3] If Antamex is unable to satisfy the "trigger" requirement by demonstrating the "occurrence" of "property damage" within the applicable policy periods, then there is no need to address the remaining issues of concerning alternative bases for barring coverage and bad faith.

Antamex takes the position that the defective sealant caused "property damage" at the time of installation or, alternatively, continuously after installation within the policy period. According to Antamex, the property damage should be deemed to have occurred at the time of installation because the physical injury was the degradation of the defective sealant, which allegedly resulted from repeated and continuous exposure to UV rays that began immediately. To the extent that property damage did not occur at the time of installation, Antamex argues that Court should still view the triggering event at a higher level of generality than suggested by Insurers. Specifically, Antamex highlights language within the definition of "occurrence," which states than an "occurrence" includes "continuous or repeated exposure to the same general harmful conditions." *See* Br. in Opp. at *21. Antamex contends that this language appears to contemplate the possibility of a "continuous trigger" occurrence. The "continuous trigger" doctrine provides that "when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy." *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976, 994–95 (3d Cir. 1996) (quoting *Owens–Illinois, Inc.*, 138 N.J. at 437, 650 A.2d at 974).

"As a general rule, the time of the 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." *Travelers Lloyds Ins. Co. v. Rigid Glob. Buildings*, No. CV 18-5814, 2020 WL 747190, at *3 (D.N.J. Feb. 13, 2020) (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18,

27 (1984)) (internal quotations omitted). To demonstrate property damage in the context of construction defect claims, there must be consequential damage to non-defective portions of the property, not simply damage to the defective work-product itself. *See Cypress Point Condo. Ass'n, Inc.*, 226 N.J. at 408, 143 A.3d at 276. "[P]roperty damage must, in fact, occur before an insurer's liability on a CGL policy can be invoked under the 'continuous trigger' theory." *Travelers Lloyds Ins. Co.*, 2020 WL 747190, at *5 (quoting *Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc.*, 343 N.J. Super. 430, 457 (App. Div. 2001); *see also Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co.*, 387 N.J. Super. 434, 445, 904 A.2d 754, 760 (App. Div. 2006) ("[New Jersey] courts have stressed that actual physical damage is required, not just economic loss or diminution, as a result of the faulty work."). With these principles in mind, it is crucial to identify the precise injurious event and its onset in order to determine whether a question exists as to Antamex's entitlement to coverage.

Here, Antamex has pointed to no proofs that the defective sealant caused actual cognizable damage to non-defective portions of the property prior to the time of its migration. Antamex submits that the trigger for coverage is either the time of installation, or a single occurrence running continuously from the time of installation at the first incidence of UV exposure first to the manifestation of property damage. However, both views overlook the prerequisite that property damage must, in fact, occur before an insurer's liability can be invoked. *See id.* Without more by way of evidence, it is speculative to assume that the sealant's negative reaction to UV exposure in localized areas within confined aspects of the IGUs prior to the time of migration would alone constitute qualifying property damage. Rather, the identifiable event capable of

triggering coverage would be that immediate incident – the migration of the sealant within the IGUs – which caused the discernible damage to the curtain wall system. In other words, even if a reaction occurred due to UV exposure immediately upon installation, it is only when the ongoing reaction culminated in the evacuation of the material from the joint, at which time it migrated to other areas, that Antamex can demonstrate with evidence a physical injury to tangible, non-defective portions of the property. *See, e.g., Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 441 N.J. Super. 369, 379, 118 A.3d 1080, 1086 (App. Div. 2015), aff'd, 226 N.J. 403, 143 A.3d 273 (2016) ("the consequential damages here are not the cost of replacing the defective work — that is the improperly installed . . . sealants. Those costs are considered a business risk associated with faulty workmanship. Rather, the consequential damages are those additional damages to the common areas of the condominium building and the unit owners' property."); *Gutierrez v. Travelers Prop. & Cas. Co. of Am.*, No. A-2483-11T3, 2013 WL 439962, at *3 (N.J. Super. Ct. App. Div. Feb. 6, 2013) (affirming trial court's holding that there was no evidence that the alleged property damage occurred during insurer's policy period where "the actual, cognizable damage to plaintiffs' property occurred after the renovations were completed and the severe cracking, shifting, and other major deficiencies began to develop.") (internal quotations omitted).

Critically, Antamex has adduced no evidence that the sealant migrated prior to the Policies' expiration. The expert opinions relied upon by Antamex attributes the sealant's migration to a "chain scission" caused by exposure to sunlight. *See* WJE Report; Klosowski Report. But the opinions do not suggest that the migration began immediately upon installation. Nor do the opinions offer a timetable for the degradation

process. Rather, the WJE Report concluded that the chain-scission resulting in the migration was triggered by "prolonged exposure to sunlight" and "further exacerbated by elevated service temperatures[.]" WJE Report at Page 6. The circumstances would perhaps create a question of fact as to the timing of the triggering event had the temporal proximity between installation and initial observation been less remote. But where that migration occurred only after "prolonged exposure" and when initial observation of this visually apparent defect was made over five years post-installation, the record simply does not support a reasonable inference that the sealant deteriorated and failed within six months during the Policy period absent further proofs.

The Court is also satisfied that Antamex is not entitled to coverage under a "continuous trigger" theory. Antamex posits that the "substantially the same general harmful conditions" language dictates that the scope of "occurrence" be understood to be broad. The Court agrees that this definition imparts the notion that accidents arising from the accretion of ongoing exposures to damage-causing conditions can constitute an occurrence. *See* Br. in Opp. at *21. Yet, this does not usurp the requirement that "'property damage must, in fact, occur before an insurer's liability on a CGL policy can be invoked under the 'continuous trigger' theory.'" *Travelers Lloyds Ins. Co.*, 2020 WL 747190, at *5, (quoting *Aetna Cas. & Sur. Co.*, 343 N.J. Super. at 457). While the WJE Report explains the mechanism of deterioration, it does not address when this process resulted in the evacuation of the sealant from the joint beyond the general conclusion that the event occurred upon "prolonged exposure to sunlight". Considered together with evidence that the migrated sealant was not discovered until 2012, Antamex's reliance on this expert opinion is insufficient to create a genuine question of fact that

consequential property damage occurred during the policy period. Because Antamex has presented no evidence of property damage occurring upon the immediate exposure of the sealant to UV rays or prior to the expiration of the policies, the Court cannot conclude that a question of fact exists that Insureds are required to defend and indemnify Antamex under a "continuous trigger" theory.

## IV.  Conclusion

For the reasons set forth herein, Zurich's Motion for Summary Judgment as to Liability [Dkt. 85] will be granted. Because the Court finds that Zurich has no duty to provide coverage, Zurich's Motion for Summary Judgment as to Damages [Dkt. 86] will be denied as moot. An accompanying order will follow.

June 22nd, 2023

Hon. Joseph H. Rodriguez, USDJ